UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| EYM PIZZA OF GEORGIA LLC, et al., §<br>§<br>  *Plaintiffs*, §<br>§<br>v. §<br>§<br>PIZZA HUT LLC, §<br>§<br>  *Defendant*. § | Civil Action No. 3:24-CV-0646-X |

## **MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiffs' EYM Pizza of Georgia LLC; EYM Pizza of Illinois LLC; EYM Pizza of Indiana LLC; EYM Pizza of SC LLC; and EYM Pizza of Wisconsin LLC (collectively, "Plaintiffs") motion for preliminary injunction against Defendant Pizza Hut LLC. (Doc. 20). Having considered the parties' briefing, evidence, and law, the Court finds that Plaintiffs failed to show a substantial likelihood of success on the merits. Accordingly, the Court **DENIES** the motion for preliminary injunction.

### **I. Background**

Plaintiffs are Pizza Hut franchisees with 142 restaurants across Illinois, Indiana, Georgia, South Carolina, and Wisconsin, employing over 1,750 people total.[1] These restaurants were operated under seven franchise agreements between Plaintiffs and Pizza Hut.[2] In mid-2021, Plaintiffs wanted to sell their restaurants, and in November 2021, Plaintiffs received an offer for their entire business for $97

---

[1] Doc. 20 at 10.

[2] Doc. 20-1 at 14.

1

million, but the prospective buyer backed out a few months later.[3]  In 2022, "hyperinflation eroded [Plaintiffs'] margins," and Plaintiffs subsequently struggled to keep up with fees and payments owed to Pizza Hut.[4]  In September 2022, Pizza Hunt first sent Plaintiffs a notice of concern about Plaintiffs' failure to pay a "critical third-party vendor."[5]  Pizza Hut then sent Plaintiffs default notices in December 2022, March 2023, and May 2023 for their failure to meet payment obligations.[6]  In July 2023, Plaintiffs hired Unbridled Capital to help with selling their business.[7]  Though Pizza Hut could have terminated the franchise agreements at that point due to Plaintiffs' multiple defaults,[8] Pizza Hut instead entered into a Forbearance Agreement with Plaintiffs on August 2, 2023.[9]  Under the Forbearance Agreement, Pizza Hut agreed it wouldn't terminate the franchise agreements until the earlier of either "[s]ale and satisfaction of all outstanding obligations due under [the] Franchise Agreements" or "the date upon which" Plaintiffs failed to strictly meet "any of the Forbearance Conditions."[10]

---

[3] Doc. 20 at 6–7.

[4] *Id.* at 7.

[5] Doc. 22, Ex. H at 2.

[6] Pizza Hut sent Plaintiffs the First Notice of Default in December 2022 for owing over $3 million.  Plaintiffs paid this off but then fell behind again, prompting Pizza Hut to send the Second Notice of Default in March 2023 for owing over $2.5 million.  Plaintiffs then paid off some, but not all, of the money owed under the Second Notice of Default.  *See* Doc. 20 at 7–8.

[7] *Id.* at 8.

[8] *See, e.g.*, Doc. 22, Exs. A at 36 & E at 60.

[9] Doc. 20 at 8.

[10] Doc. 20-1 at 8.

2

Pizza Hut continued to serve notices of default in January and February 2024.[11] Then, Pizza Hut sent a Notice of Termination of the Forbearance Period on February 23, 2024, informing Plaintiffs that due to failing to comply with the Forbearance Conditions of the Forbearance Agreement, Pizza Hut may terminate or close Plaintiffs' restaurants or take "any other legal action available to [Pizza Hut]."[12]

Plaintiffs sued in state court for breach of contract, tortious interference with contracts and prospective business relations, and breach of fiduciary duty, and obtained a Temporary Restraining Order ("TRO").[13] Pizza Hut removed the case, and this Court extended the TRO[14] and granted in part Plaintiffs' motion for expedited discovery.[15] Plaintiffs then moved for a preliminary injunction, seeking to enjoin Pizza Hut from terminating Plaintiffs' ability to operate their restaurants, removing Plaintiffs' restaurants from the Pizza Hut online ordering system, interfering with online orders from Plaintiffs' restaurants, contacting Plaintiffs' lender, disrupting Plaintiffs' ability to receive supplies, and disclosing any confidential information to prospective purchasers of Plaintiffs' business to Plaintiffs' detriment.[16]

## II. Legal Standard

---

[11] Doc. 20 at 9–10.  Even though Plaintiffs had paid Pizza Hut $13,784,695.45 since the First Notice of Default in December 2022 through December 2023, they were still behind.  *Id.* at 10.

[12] Doc. 22, Ex. P at 4.

[13] Doc. 1-5; Doc. 1-13.

[14] Doc. 10.

[15] Doc. 17.

[16] Doc. 20; Doc. 20-5 at 2.

3

To receive a preliminary injunction, Plaintiffs "must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest."[17] An injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion."[18] Plaintiffs bear the burden of proving all four factors. And failure on any one of them warrants denial.[19]

### III. Analysis

"A preliminary injunction may be issued on a *prima facie* showing that the party seeking it is entitled to relief."[20] Plaintiffs move for a preliminary injunction on three claims: (1) that Pizza Hut breached the Forbearance Agreement; (2) that Pizza Hut tortiously interfered with Plaintiffs' contracts and prospective relations; and (3) that Pizza Hut breached its fiduciary duty.[21] The Court addresses each in turn and finds Plaintiffs have not shown a substantial likelihood of success on the merits on these three claims. As such, the Court **DENIES** Plaintiffs' motion for a preliminary injunction.

#### A. Breach of the Forbearance Agreement

---

[17] *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 288 (5th Cir. 2012).

[18] *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

[19] *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009); *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).

[20] *Brock Servs., L.L.C. v. Rogillio*, 936 F.3d 290, 296 (5th Cir. 2019) (emphasis in original).

[21] Doc. 20 at 15.

To support a claim for breach of contract under Texas law,[22] a plaintiff must show "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach."[23]

Plaintiffs' motion jumps straight into breach, rather than walking through the four elements.[24] But as Seinfeld teaches, some things are too important to "Yada Yada" over.[25] And the Court is not at liberty to Yada Yada over elements Plaintiffs don't prove. First, Plaintiffs don't address whether the Forbearance Agreement is a valid contract, but Pizza Hut doesn't address it either. Even assuming it is a valid contract, Plaintiffs' motion is silent as to whether they performed under the Forbearance Agreement. In fact, Plaintiffs seem to admit they *didn't* perform when they argue, "[b]ut for Pizza Hut's interference with [Plaintiffs'] effort to sell their franchisee restaurants to third-party purchasers, [Plaintiffs] would have fulfilled all their contractual duties under the Forbearance Agreement."[26] What were Plaintiffs

---

[22] The Forbearance Agreement is governed by Texas law. *See* Doc. 20-1 at 12.

[23] *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 579 (5th Cir. 2015) (citing *Foley v. Daniel*, 346 S.W.3d 687, 690 (Tex. App.—El Paso 2009, no pet.)).

[24] The Court notes that the entirety of Plaintiffs' motion devoted to arguing the merits factor is two pages long for all three of their claims. *See* Doc. 20 at 15–17.

[25] Seinfeld, The Yada Yada, Season 8, Episode (Apr. 24, 1997).

[26] Doc. 24 at 3. If Plaintiffs are insinuating that Pizza Hut's communications with prospective buyers prohibited them from meeting the Forbearance Conditions, the Court has two responses. First, it's unclear to the Court—and Plaintiffs do not explain—how Pizza Hut's communications with prospective buyers would affect Plaintiffs' obligations to pay on time, provide financial reporting, keep up to date with landlords and vendors, or maintain operational standards—all obligations they failed to meet *in addition* to the sales milestones. And second, Plaintiffs' alleged justification for failing to perform, that Pizza Hut communicated with potential buyers, is in fact *allowed* under the Forbearance Agreement. The Court discusses this more when it addresses Plaintiffs' tortious interference claims. *See infra* III.B.

required to do under the Forbearance Agreement? Under 6.2 of the Forbearance Agreement, Plaintiffs agreed to several Forbearance Conditions, including requirements to:[27]

- "pay on a monthly basis, no later than 20 days after such amounts are due any and all amounts to Franchisor (or its designee(s) as the case may be) for royalties, advertising fees, and any other amounts typically paid to Franchisor by Franchisees . . . for the period arising on and after the date of this Agreement";
- "continue normal business operations" with landlords and vendors and remain current on payments with them;
- "enter[] into a letter of intent with a Purchaser to effect the Sale of the Restaurants" by November 15, 2023;
- "enter[] into a binding written purchase agreement with a Purchaser to effect the Sale of all of the Restaurants" by January 15, 2024;
- provide "quarterly consolidated financial statements, quarterly store-level profit and loss statements" within 45 days after the end of each quarter;
- and achieve certain sales and operations metrics.

Pizza Hut argues that Plaintiffs didn't perform by failing to meet these critical conditions.[28] For example, Plaintiffs fell behind on payments with a landlord and pest control provider and received notices to that end.[29] As to failing to meet operational standards, one of Plaintiffs' employees in a South Carolina store reported that the kitchen lacked air conditioning since 2021,[30] and Plaintiffs' rating in Pizza Hut's metric "(which tracks among other things, food safety compliance check scores, delivery time, and operating hours)" fell below the requirement outlined in the

---

[27] Doc. 20-1 at 8–9.

[28] Doc. 21 at 19 (stating that Plaintiffs failed to meet §§ 6.2(b), 6.2(e), 6.2(f), 6.2(g), 6.2(k), 6.2(*l*) of the Forbearance Agreement).

[29] *See* Doc. 22, Ex. N & X; *see also* Ex. Y at 7, 10 (Diane Simrall declaration).

[30] *See* Doc. 22, Ex. S; *see also* Ex. Y at 7.

Forbearance Agreement.[31]  Pizza Hut also argues that Plaintiffs failed to meet the financial reporting, timely payment, and sales milestone requirements.[32]

Plaintiffs don't seem to dispute violating those forbearance conditions. Instead, they offer justifications.  Plaintiffs argue that although they made late payments, they still at least paid some.[33]  Plaintiffs further attempt to justify the inability to sell their restaurants.  In August 2023—ahead of the November 15 deadline—Plaintiffs put their Illinois, Indiana, and Wisconsin restaurants on the market through their broker, Unbridled Capital.[34]  On November 12, 2023, Dew Real Estate Holdings, LLC ("Dew Holdings") gave Plaintiffs a letter of intent for $25 million for Plaintiffs' 96 restaurants in Illinois, Indiana, and Wisconsin but then later pulled out.[35]  Plaintiffs also received a letter of intent for the Wisconsin restaurants from Ambros Foods, LLC on November 15, 2023.[36]  So by the deadline, Plaintiffs had received at least two letters of intent.  Plaintiffs didn't even put their Georgia and South Carolina restaurants on the market until November 27, 2023—nearly two weeks after the deadline.[37]  Plaintiffs claim that Pizza Hut is "trying to force [Plaintiffs] to sell for pennies on the dollar all its markets, yet [Plaintiffs] ha[ve] not

---

[31] Doc. 21 at 13, n. 7.

[32] *Id.* at 13.

[33] Doc. 24 at 6 ("despite the large defaults [Plaintiffs] *albeit a bit late* ha[ve] continued to meet and pay [their] obligations to Pizza Hut") (emphasis added).

[34] Doc. 20 at 8.

[35] *Id.* at 9.  Plaintiffs claim Dew Holdings had initially "indicated their interest" in purchasing the restaurants for $32 million, then revised the amount to $29.5 million "with very onerous conditions." *Id.* The November letter of intent to purchase for $25 million was then even lower.

[36] *Id.*; Doc. 20-2 at 44.

[37] *See* Doc. 20 at 9.

received one real and binding offer."[38]  But even if they're only receiving "low-ball LOI"s,[39]  Plaintiffs agreed to the sale milestones in the Forbearance Agreement.[40]  And to date, Plaintiffs haven't entered into any letter of intent nor asset purchase agreement.  It's not enough for Plaintiffs to argue "it is impossible to comply" with the Forbearance Agreement because they have "no control over whether a third-party makes an offer or not and … whether Pizza Hut approves the purchaser of an offer that [Plaintiffs] accept[]."[41]  Plaintiffs agreed to those terms, conditions, and deadlines.  The Court cannot hold that it is likely that Plaintiffs performed.

As for breach, Plaintiffs contend that when Diane Simrall, Pizza Hut LLC's Director of Franchise Finance and Non-Traditional Development, contacted its bank, Pizza Hut violated Section 3.2 of the Forbearance Agreement.[42]  In relevant part, section 3.2 states, "Franchisor shall be permitted to communicate freely with . . . (iii) creditors for the operation of Franchisee's business."[43]

On February 15, 2024, Ms. Simrall sent an email to a representative from Plaintiffs' lender, in which she stated, "We would like to connect with you on one of

---

[38] Doc. 20 at 10–11.

[39] *Id*. at 11*; see also* Doc. 20-2 at 66.  Plaintiffs received another letter of intent on February 14, 2024 to purchase fifteen of Plaintiffs' restaurants in Indiana for $1.5 million.  Plaintiffs claim this was a "low-ball LOI" and, though received nearly three months after the deadline, Plaintiffs still didn't enter into it.

[40] Salvador Elias, one of Plaintiffs' officers, stated in a declaration that he negotiated the Forbearance Agreement and he "vehemently objected to arbitrary dates since we had no control over [] prospective purchasers or offers to be made."  Doc. 20-1 at 2.  Even if Mr. Elias did object to the specific deadlines, and even if Plaintiffs thought the sales deadlines were flexible, *see* Doc. 24 at 5–6, they agreed to them as written.

[41] Doc. 20 at 13.

[42] *Id.* at 15–16.

[43] Doc. 20-1 at 6.

8

our franchisees, Eduardo Diaz.  We believe he has an outstanding loan with your bank.  Do you have time tomorrow or Monday to connect?"[44]  The email includes a response from the bank representative, offering additional times to connect.[45]  But Pizza Hut claims no meeting was ever scheduled.[46]

Plaintiffs make two arguments as to why Ms. Simrall's communication was a breach.  First, Mr. Elias declared he "objected to the inclusion of Plaintiffs' lenders as a party [with] whom [Pizza Hut] was authorized to communicate" and, as such, the parties "express[ly] excluded Plaintiffs' lenders" from Section 3.2.[47]  Pizza Hut argues, and the Court agrees, that it was *permitted* to contact Plaintiffs' bank since the lender was one of Plaintiffs' "creditors" as provided in the agreement.[48]  A "creditor" is "[o]ne to whom a debt is owed."[49]  One need not squint to make sense of this.  Plaintiffs' bank was a creditor, and "a contract's plain language controls, not what one side or the other alleges they intended to say but did not."[50]  The plain text of the Forbearance Agreement allowed Pizza Hut to "communicate freely" with Plaintiffs' "creditors for the operation of Plaintiffs' business."[51]

---

[44] Doc. 20-3 at 11.

[45] *Id.*

[46] *Id.* at 3–4.

[47] Doc. 20-1 at 2.

[48] Doc. 21 at 20.

[49] *Creditor*, Black's Law Dictionary (11th ed. 2019).  Because the Forbearance Agreement does not define "creditor," the Court looks to widely accepted dictionaries for the public meaning of this legal term.

[50] *Pathfinder Oil & Gas, Inc. v. Great Western Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019).

[51] Doc. 20-1 at 6.

This leads to Plaintiffs' second argument. Plaintiffs claim that even if the provision allowed Pizza Hut to communicate with lenders, "that was only limited to parties interested in and/or necessary to the Sale," and their bank "has nothing to do with the ordinary course of business."[52] But the contract doesn't narrow the zone of communication to those creditors dealing with Plaintiffs' ordinary course of business. Rather, it allows Pizza Hut to talk with Plaintiffs' creditors "for the operation of [Plaintiffs'] business,"[53] and since Plaintiffs have an outstanding loan with the bank, Pizza Hut was permitted to communicate with them.[54] In fact, Ms. Simrall's declaration states that it wasn't until Plaintiffs' counsel represented "that [Plaintiffs'] lender was unlikely to approve any sale of the restaurants for the amounts in the bids being submitted to it," that Pizza Hut sought to meet with the bank.[55] The Court finds that not only was Ms. Simrall's email to Plaintiffs' lender not an actionable breach, but it was conduct the Forbearance Agreement presupposed and allowed.

Because Plaintiffs fail to establish likelihood of success on the elements of performance and breach, the Court doesn't need to address damages. The Court finds that Plaintiffs aren't likely to succeed on their breach of contract claim.

### B. Tortious Interference with Contracts and Prospective Relations

Tortious interference with a contract is a legally distinct claim from tortious interference with prospective business relations. Plaintiffs brought both types of

---

[52] Doc. 20 at 16.

[53] *See* Doc. 20-1 at 6.

[54] The Court also notes that a meeting was never scheduled, and to date, that email was the only occasion that Pizza Hut reached out to Plaintiffs' lender. *See* Doc. 20-3 at 3–4.

[55] Doc. 22, Ex. Y at 9.

claims. The Court addresses the tortious interference with contracts claim first. Under Texas law,[56] a prima facie showing of tortious interference with a contract requires showing: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss."[57] For this claim, Plaintiffs provide only two sentences to the Court in their motion—without any supporting caselaw or evidence.[58] From what the Court can ascertain, Plaintiffs claim is that Pizza Hut tortiously interfered with their bank loan contract.[59] To start, Plaintiffs provide no evidence or assertion of their contract with their lender apart from including a mere mention of it in the heading to this claim.[60] In short, Plaintiffs haven't shown the existence of the contract.[61] And they haven't established the remaining elements either. To the extent Plaintiffs are implicating the email Ms. Simrall sent to their bank lender for interference, as the Court already addressed, such an "interference" was permitted by the Forbearance Agreement.[62] Finally, Plaintiffs have not alleged a specific injury from Ms. Simrall's email to their lender

---

[56] Plaintiffs do not argue that any other law governs their torts claims.

[57] *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

[58] *See* Doc. 20 at 17.

[59] *See id.* at 16.

[60] *See id.*

[61] *See McDonald Oilfield Ops., LLC v. 3B Inspection, LLC*, 582 S.W.3d 732, 751 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("A general statement that a contract with [another] exists, without details about the specific terms of the contract, is insufficient to maintain a tortious-interference-with-contract claim.").

[62] *See supra* III.A.

11

nor proximate causation. The Court finds that Plaintiffs failed to show a likelihood of success on their tortious interference with a contract claim.

Plaintiffs' tortious interference with prospective business relations likewise fails. To make a prima facie showing of this claim, Plaintiffs must establish

> (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.[63]

Plaintiffs claim "Pizza Hut has gone to great lengths to interfere with and sabotage [Plaintiffs]" and "communicat[e] confidential information to the potential purchasers to the detriment of [Plaintiffs.]"[64] But Plaintiffs don't identify who the buyers were, "the content of Pizza Hut's alleged statements, or when and how such statements caused a loss of any business opportunity."[65] Plaintiffs follow up with assertions that various prospective purchasers lowered their offers or were no longer interested in purchasing the franchises after the prospective buyers spoke with Pizza Hut.[66] But, again, Plaintiffs don't provide support that offers by prospective purchasers were either lowered or cut off altogether because of Pizza Hut's conversations with the prospective buyers. When asked by Plaintiffs if Pizza Hut

---

[63] *Nix v. Major League Baseball*, 62 F.4th 920, 934 (5th Cir. 2023) (citing *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013)).

[64] Doc. 20 at 11.

[65] Doc. 21 at 22.

[66] Doc. 24 at 6.

...

communicated with prospective buyers, Pizza Hut admitted as much, "regarding [Plaintiffs'] portfolio as part of discussions in the ordinary course of business for dealings with potential purchasers."[67] And just as for creditors, Section 3.2 of the Forbearance Agreement expressly allowed Pizza Hut to:

> communicate and share information, including without limitation information about the Restaurants and the related market(s), directly with any third-parties, including without limitation Purchaser (once Purchaser is identified as a potential purchaser by Franchisee), landlords, or any other party interested in and/or necessary to the Sale and/or the Restaurants … Notwithstanding anything set forth [in the Forbearance Agreement] Franchisor shall be permitted to communicate freely with (i) existing franchisees of Pizza Hut restaurants in the ordinary course of business.[68]

Pizza Hut confirms that this was pro forma behavior—"especially when a franchisee has showed signs of financial distress."[69] "[R]egularly interact[ing] with existing franchisees' creditors and potential new franchisees to support transactions related to Pizza Hut restaurants . . . reflects Pizza Hut's typical collaboration and approval process."[70]  Because the Court finds that Pizza Hut's conduct wasn't "independently tortious or unlawful," it need not reach the other elements for a tortious interference with prospective business relations claim.

As such, the Court finds that Plaintiffs failed to show a substantial likelihood of success on the tortious interference with contracts and prospective business relations claims.

---

[67] Doc. 20-3 at 6 (Pizza Hut's responses to Plaintiffs' Requests for Admission Nos. 13 and 14).
[68] Doc. 20-1 at 6.
[69] Doc. 21 at 12.
[70] *Id.*

## C. Breach of Fiduciary Duty

"The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship must exist between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant."[71]  Plaintiffs assert they're entitled to a preliminary injunction on their breach of fiduciary duty claim.  Yet, they provide no caselaw or supporting evidence.[72]  Pizza Hut, on the other hand, provides two arguments against owing a fiduciary duty.

First, Pizza Hut contends that Texas Law forecloses fiduciary duties under franchise relationships.[73]  The Texas Supreme Court held, as a matter of law, that there was no fiduciary relationship between parties of a franchise agreement "because there was no evidence of a 'confidential relationship' between them."[74]  Here, Plaintiffs provided no evidence that their relationship with Pizza Hut involved "personal trust and confidence above and beyond that which is ordinarily contemplated by parties to contracts of this type."[75] Instead they provided only two

---

[71] *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 215 (5th Cir. 2018) (cleaned up) (quoting *Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex. App.—Dallas 2010, no pet.)).

[72] *See* Doc. 20 at 17.

[73] Doc. 21 at 23.

[74] *Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*, 55 F.3d 181, 188 (5th Cir. 1995) (discussing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992) (superseded by statute on other grounds)).

[75] *Crim Truck*, 823 S.W.2d at 595–96.

unsupported assertions that Pizza Hut "owes fiduciary duties" and that it breached those duties.[76]

Pizza Hut's second argument is affirmative evidence that *no* fiduciary relationship existed between the parties. Pizza Hut points to six of the seven franchise agreements that make clear "that the relationship created by this Agreement is not a fiduciary, special, or any other similar relationship."[77] Because Plaintiffs failed to offer evidence of any special relationship, and six of the seven franchise agreements themselves are evidence that no such relationship existed, the Court finds that Plaintiffs failed to show a substantial likelihood of success on the breach of fiduciary duty claim.

### IV. Conclusion

The Court finds that there is not a substantial likelihood of success on the merits of any of Plaintiffs' three claims at issue in this motion. Accordingly, the Court **DENIES** Plaintiffs' motion for a preliminary injunction.

It is **SO ORDERED**, this 2nd day of April, 2024.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[76] Doc. 20 at 17.

[77] Doc. 22, Exs. A at 39, C at 26, D at 27 (Franchise Agreements Nos. 1225, 1462, and 1463). *See also* Doc. 22, Exs. E at 67, F at 69, G at 68 (Franchise Agreements Nos. 1481, 1482, and 1486 also state that "[n]othing in this Agreement may be construed to create a partnership, joint venture, agency, employment or fiduciary relationship of any kind.").

15